UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

FRANKLIN  JONES,                          §
                                          §
        Plaintiff,                        §
VS.                                       §        CIVIL ACTION NO. 2:14-CV-428
                                          §
BUCK  TAYLOR, *et al*,                    §
                                          §
        Defendants.                       §

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff Franklin Jones complains that on October 17, 2013, Defendant Captain Buck Taylor used excessive force against Plaintiff when he applied handcuffs to tight, injuring Plaintiff's wrists.  (D.E. 1).  Defendant Taylor has filed a motion for summary judgment to dismiss this action on the grounds that Plaintiff failed to exhaust his administrative remedies.  (D.E. 44).  In the alternative, Defendant argues that he is entitled to qualified immunity because Plaintiff suffered no more than a *de minimis* injury and that Defendant's actions were objectively reasonable.  *Id.*  Plaintiff has filed a response in opposition.  (D.E. 64).

For the reasons stated herein, Defendant's motion for summary judgment is granted, and Plaintiff's claims against Defendant are dismissed with prejudice.

## I.      JURISDICTION.

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  Upon consent of the parties (D.E. 9, 58), this case was referred to the undersigned United States magistrate judge to conduct all further proceedings, including entry of final judgment.  (D.E. 59).  *See* 28 U.S.C. § 636(c).

## II.     PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is currently confined at the Wayne Scott Unit in Angleton, Texas, although his complaint concerns events that occurred while he was incarcerated at the McConnell Unit (MCU) in Beeville, Texas.  Plaintiff filed his original complaint on October 20, 2014, alleging that Captain Taylor used excessive force against him on October 17, 2013, injuring his wrists.  (D.E. 1).  He also named as Defendants Assistant Warden Maria Ramirez and Grievance Investigator Joe Hernandez alleging that these individuals failed to investigate properly his use of force claim against Defendant. *Id.*

A *Spears*[1] hearing was conducted on December 4, 2014, following which Plaintiff's excessive force claim against Captain Taylor in his individual capacity was retained, and his remaining claims against the remaining Defendants, as well as any claims against Captain Taylor in his official capacity, were dismissed.  (D.E. 12).

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985*); see also Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a *Spears* hearing is incorporated into the pleadings).

On December 23, 2014, Plaintiff filed a motion for a temporary restraining order (TRO) (D.E. 13), and his request was denied.  (D.E. 15).

On January 30, 2015, Defendant filed his Answer and raised the defense of qualified immunity.  (D.E. 20).

On February 10, 2015, Defendant filed his First Supplement to his Answer.  (D.E. 26).

On June 12, 2015, Defendant filed the instant motion for summary judgment. (D.E. 44).

Following an extension of time, on July 29, 2015, Plaintiff filed his summary judgment response.  (D.E. 64).

## III.   SUMMARY JUDGMENT EVIDENCE.

In support of his motion for summary judgment, Defendant offers the following:

| | |
|---|---|
| Ex. A: | Copy of Administrative Directive (AD)-03.82, Management of Offender Grievances (D.E. 44-1, pp. 2-9); |
| Ex. B: | Relevant portions of Plaintiff's grievance records (D.E. 44-2, pp. 3-7); |
| Ex. C: | Affidavit of No Use of Force report for October 17, 2013 (D.E. 44-3, p. 2); |
| Ex. D: | Relevant portions of Plaintiff's medical records, filed under seal (D.E. 45-1, pp. 2-20); and |
| Ex. E: | *Spears* hearing transcript (D.E. 44-4, pp. 2-28). |

In his summary judgment response, Plaintiff offers Exhibit 1 which is a copy of a radiology report dated January 17, 2014 from the University of Texas Medical Branch, Correctional Managed Care (UTMB-CMC).

The summary judgment establishes the following:

Plaintiff has been in TDCJ custody since 2004 serving a 50-year sentence for aggravated robbery.   On October 17, 2013, he had been housed at the MCU for approximately eleven to twelve years.  (D.E. 44-4, *Sp*. Tr., p. 4).

*The October 17, 2013 Use of Force (UOF).*

In October 2013, Plaintiff was living in a single-man cell.  (D.E. 44-4, *Sp*. Tr., p. 4).  On October 17, 2013, a female sergeant came to Plaintiff's cell and told him that he was going to be moved to a two-man cell and to pack his property.  *Id.*  Plaintiff objected to the move stating that his proposed new cellmate was a racist who had caused problems for his cellmates in the past.  *Id.*  The female sergeant "got mad" and advised Plaintiff not to protest the move or he would be disciplined.  (D.E. 44-4, *Sp. Tr.*, pp. 4-5).  Captain Taylor and the female sergeant verbally threatened Plaintiff stating that, if he did not voluntarily move to the two-man cell, they would use chemical agents and physically remove him from the single-man cell.  (D.E. 44-4, *Sp. Tr.,* p. 5).  A second female officer did not want to see Plaintiff get hurt and she pleaded with him to give the new living arrangement a try for a couple of days.  *Id.*

As he was packing his property to move, an officer came to escort Plaintiff to medical for his insulin shot.  (D.E. 44-4, *Sp. Tr.*, pp. 5, 7-8).  On his way to get insulin, Plaintiff talked to Defendant and asked him why prison officials would put a Black

prisoner in the same cell with a known racist. *Id.* at p. 5. Defendant replied, "Are you going to move? Or I'm going to lock you up and I'm going to store all your property." *Id.* Plaintiff admits that he and Defendant "got to talking loud," and Defendant asked, "Are you threatening me?" *Id.,* p. 8. Plaintiff did not reply, but just turned around and submitted to restraints, which Defendant applied. *Id.* The restraints were metal, and Defendant put them on Plaintiff too tightly. *Id.*, p. 9. Plaintiff told Defendant that the restraints were too tight, but at that time, a lieutenant and another officer arrived to continue escorting Plaintiff to medical. *Id.* As Defendant left, he said "Jones, don't give nobody no problems." *Id.* In response, Jones agreed to the move. *Id.*

Plaintiff then went to medical and received his insulin shot. (D.E. 44-4, *Sp. Tr.*, p. 10). The restraints were removed in the infirmary, but Plaintiff did not seek medical attention for his sore wrists at the time. *Id.* He was then escorted back to his old cell where he gathered his belongings and then moved to the new cell. *Id.* As it turns out, the offender in the cell to which Plaintiff was moved was not a racist, but Plaintiff still objected to the move because it was an accommodation to the other prisoner, the one that got Plaintiff's single-man cell, at the expense of Plaintiff's comfort. (D.E. 44-4, *Sp. Tr.*, pp. 6-7).

Plaintiff did not receive a disciplinary case regarding the October 17, 2013 events, nor was an official UOF report prepared concerning Defendant's use of the hand restraints. (*See* D.E. 44-3, p. 2, Affidavit of Evelyn Jenkins, TDCJ Administrative Monitor for Use of Force, testifying that there is no UOF report for the October 17, 2013 incident that forms the basis of Plaintiff's lawsuit against Defendant).

The next morning, Plaintiff did not have any feeling in his fingers.  (D.E. 44-4, *Sp. Tr.*, p. 12).

*Plaintiff's Medical History and Records.*

At the *Spears* hearing, Plaintiff testified that he has a history of carpel tunnel syndrome in his left forearm, along with a piece of glass near the main artery, from when he was in the military.[2]  (D.E. 44-4, *Sp. Tr.*, p. 11).  However, he claims that, when Defendant applied the restraints, "he tore the ligaments up in there."  *Id.*  The restraints were on for five to ten minutes.  *Id.*

On October 19, 2013, Plaintiff reported to the MCU emergency room complaining about shortness of breath, chest pain, and excessive perspiration caused by being moved to another cell and the confiscation of his radio.  (D.E. 45-1, pp. 3-5).  Plaintiff's vital signs were within normal limits.  *Id.,* p. 4.  Nurse Munoz noted that Plaintiff was alert, coherent, and in no acute physical distress.  *Id.,* p. 5.  His heart tones were audible and she could differentiate systole and diastole functions.  *Id.*  There were no murmurs or gallops.  *Id.*  Plaintiff's lungs were aerating equally and were essentially clear.  *Id.*  His skin was warm and dry and his lips pink.  *Id.*  A 12-lead EKG was performed and there

---

[2] Carpal tunnel syndrome occurs when the median nerve, which runs from the forearm into the palm of the hand, and is housed in the carpal tunnel– a narrow, rigid passageway of ligament and bones at the base of the hand – becomes pressed or squeezed at the wrist.  The result may be pain, weakness, or numbness in the hand and wrist, radiating up the arm.  Carpal tunnel syndrome is often caused by a combination of factors that increase pressure on the median nerve and tendons.  In most cases, the disorder is due to a congenital predisposition: the carpal tunnel is simply smaller in some people than others.  Other contributing factors include trauma or injury to the wrist that cause swelling, such as a sprain or fracture; over activity of the pituitary gland; hypothyroidism; rheumatoid arthritis; mechanical problems in the wrist joint; work stress; repeated use of vibrating hand tools, or the development of a cyst or tumor in the canal. *See* http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm#282153049.

were no changes.  *Id.*  Plaintiff was released to his cell and advised to return should he become concerned again.  *Id.*

On October 22, 2013, Plaintiff reported to the MCU infirmary complaining that he was involved in a UOF on October 17, 2013, and that the restraints had been applied too tightly, causing his old military injury to be aggravated, and that the skin on his wrists had been bruised and slightly cut.  (D.E. 45-1, pp. 6-8).  Upon examination, Physician's Assistant (PA) Erick Echavarry noted no abnormalities detected (NAD), but he did observe a small 5 mm scar on Plaintiff' left ulnar aspect of his lower arm suggesting a past carpal tunnel surgery to the left forearm.  *Id.* at 7.  Plaintiff had good strength bilaterally and his deep tendon reflexes (DTRs) were +2 bilaterally.  *Id.*  PA Echavarry's diagnosis was bilateral wrist pain secondary to a UOF, and he prescribed Plaintiff Tylenol, 325 mg, twice a day, for three days.  *Id.*  The plan was for Plaintiff to follow up as needed if the pain got worse.  *Id.*

On November 12, 2013, Plaintiff returned to the MCU infirmary complaining of right wrist pain with tingling in his fingers, extending up his entire arm.  (D.E. 45-1, pp. 9-11).  Plaintiff reiterated that he was injured in the military in 1982 and that he still had a piece of glass in his left forearm near an artery.  *Id.*, p. 10.  Plaintiff reported that he had a history of bilateral carpal tunnel syndrome that was aggravated by the UOF, and he requested a referral to Brace & Limb for a hand brace.  *Id.*  Upon examination, PA Susanna Corbett found that Plaintiff had a positive Tinel's sign and Phalen's maneuver, two tests employed to diagnosis carpal tunnel syndrome, of the right wrist.  *Id.*  PA Corbett's plan was to order Plaintiff a soft wrist brace for support.  *Id.*

On December 20, 2013, Plaintiff was placed on the medical chain to Hospital Galveston to be seen by Brace & Limb for a wrist brace.  (D.E. 45-1, pp. 12-14).

On January 10, 2014, Plaintiff reported to the infirmary complaining of pain in both wrists and requesting that his wrists be x-rayed to help with the diagnosis.  (D.E. 45-1, pp. 15-18).  Plaintiff also complained of diarrhea, a runny nose, and needing his TED hose pass renewed.  *Id.*, p. 16.  PA Echavarry noted pain to both wrists with palpation and flexion.  *Id.,*p. 17.  PA Echavarry's diagnosis was carpal tunnel syndrome and extremity pain, and he ordered x-rays of both wrists.  *Id.*

On January 24, 2014, Plaintiff's reported to the infirmary for his x-ray results.  (D.E. 45-1, pp. 19-20).  (*See also* Plaintiff's SJ Response, D.E. 64-1, pp. 2-3).  The right wrist x-ray showed widening of the scapholunate space consistent with scapholunate ligament disruption with mild inferior migration of the capitate.[3]  *Id.*, p. 19.  There was no acute fraction or dislocation.  *Id.*  The rest of the bony structures and soft tissue appeared unremarkable.  *Id.*  His left wrist revealed no fracture or dislocation, and the soft tissues were unremarkable.  *Id.*  The radiologist's impression was SLAC of the right wrist, and the plan was to refer Plaintiff to Brace & Limb.  *Id.*

---

[3] The scapholunate ligament is a ligament in the wrist that joins two adjacent wrist bones, the scaphoid and the lunate, together.  When the ligament is torn, the bones separate in different directions, resulting in pain and a loss of grip strength.  It is the most common of all wrist injuries.  If left untreated, a scapholunate ligament tear can lead to scapholunate advanced collapse (SLAC) and arthritis.  *See* http://occupational-therapy.advanceweb.com/Archives/Article-Archives/Scaphoid-and-Scapholunate-Ligament-Injuries.aspx.

At the *Spears* hearing, Plaintiff testified that he received a wrist brace. (D.E. 44-4, pp. 19). However, he continues to have problems writing, and so physical therapy was ordered. *Id.* He is scheduled to go to Hospital Galveston for a needle puncture test to evaluate the severity of his carpal tunnel syndrome in the right wrist. *Id.*

## IV.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider

hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

V.      **DISCUSSION.**

A.      **Exhaustion.**

Defendant moves for summary judgment to dismiss Plaintiff's claims for failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).  (*See* D.E. 44, pp. 5-6). The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S. C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).   A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints.  *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam).   Step 1 requires the

inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident.   (*See* D.E. 44-1, pp. 2-9, AD-03.82, Management of Offender Grievances (rev. Jan. 4, 2012)).   The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has fifteen calendar days to appeal by filing a Step 2 grievance, which is handled at the state level.   *Id.,* p. 7. The Fifth Circuit requires that both steps be completed in order to file suit in federal court.   *Johnson v. Johnson*, 385 F.3d 503, 515-16 (5th Cir. 2004) ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted.").   *See also Dillion v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) ("under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly.").

On October 24, 2013, Plaintiff filed a Step 1 grievance, Grievance No. 2014033387, complaining that on October 17, 2013, Defendant placed him in hand restraints because he refused to move.  (D.E. 44-2, pp. 3-4).  Plaintiff continues:

> …The restraints (handcuffs) were placed on extremely tight, cutting off blood circulation to my hands and leaving a very bad bruise on my wrist. Capt. Taylor removed the restraints only after I told him I would move.
>
> Capt. Taylor did not take me to the infirmary even though I complained to him about my wrist being in pain from the tightness of the restraints.
>
> Note: I am still having numbness and pain in both of my hands from Capt. Taylor having placed the restraints on me extremely tight.

(D.E. 44-2, p. 3).

For relief, Plaintiff requested that "corrective action be taken" and that he not be retaliated against for filing the grievance.  (D.E. 44-2, p. 4).

On January 13, 2014, Warden Ramirez denied Plaintiff's Step 1 grievance stating that his claims were investigated but there was no evidence to substantiate his allegations. (D.E. 44-2, p. 4).

On January 24, 2014, Plaintiff filed a Step 2 appeal of Grievance No. 2014033387.[4]  (D.E. 44-2, pp. 5-6).  Plaintiff complained that a grievance investigator had not reviewed his medical records and that no one from the Grievance Department or the Safe Prisons Program had come to talk to him or to observe the bruises on his wrist from the handcuffs being too tight.  *Id.*, p. 5.  By response dated February 25, 2014, Plaintiff was advised that the Office of the Inspector General (OIG) conducted an investigation and found insufficient evidence to open an OIG case.  *Id.,* p. 6.  In addition, the Central Grievance Office conducted an investigation and found it necessary to advise Plaintiff that he could not ask for any form of disciplinary action to be taken against staff members as asking for such relief would be justification to return the grievance unprocessed.  *Id.,* p. 6.

Defendant argues that Plaintiff's Step 2 appeal was filed untimely.  (D.E. 44, p. 10).  He points out that the Step 1 response was returned to Plaintiff on January 14, 2014, and under AD-03.82, Plaintiff had fifteen days, or until January 29, 2014 to timely file his Step 2 appeal.  Defendant claims that Plaintiff's Step 2 appeal was not submitted to

_____

[4] Plaintiff dated the grievance January 24, 2014, but it is file-stamped as received by the MCU grievance officer on February 13, 2014.  (D.E. 44-2, pp. 5-6).

the MCU grievance investigator until February 13, 2014.  Defendant contends that the untimeliness of Plaintiff's Step 2 appeal should result in dismissal of Plaintiff's claims against Defendant for failure to exhaust.

Defendant fails to establish that there is no genuine issue of a material fact regarding exhaustion.  First, Plaintiff's Step 2 appeal was executed on January 24, 2014, that is, within fifteen days of his receipt of the Step 1 response, and therefore timely under AD 03.82.  (*See* D.E. 44-2, p. 6).  Under the prison mailbox rule, *pro se* prisoner filings are deemed filed as soon as they are deposited into the prison mail system.  *See Medley v. Thaler,* 660 F.3d 833, 835 (5th Cir. 2011) (citing *Houston v. Lack,* 487 U.S. 266 (1988).  Defendant offers no evidence to suggest that Plaintiff failed to deposit his grievance into the mail system on the date it was executed.  Defendant does not offer the affidavit of the MCU grievance investigator swearing that the Step 2 appeal did not arrive before the date it was file stamped, nor does he offer the mailroom logs or internal mail ledgers to document that Plaintiff's Step 2 appeal was submitted at a later date than when he signed it.

Second, Plaintiff's Step 2 appeal was not rejected as untimely at the state level, but to the contrary, it was evaluated by both the OIG and the Central Grievance Office, and ruled on.  (D.E. 44-2, p. 6).  Indeed, Plaintiff could argue that he relied on the rejection of his Step 2 appeal in bringing this lawsuit and that Defendant is estopped from invoking the exhaustion defense since other prison officials previously waived it by processing his Step 2 appeal.  *See Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) (recognizing that misleading statements by prison officials could impact whether remedies are available to

an inmate under § 1997e(a) and that estoppel excuses a prisoner's failure to exhaust administrative remedies).

Plaintiff's Step 1 and Step 2 grievances placed Captain Taylor on notice of his claims against him, thus satisfying the purpose of the exhaustion requirement.  *See Johnson,* 385 F.3d at 517 (noting that one of the purposes of the exhaustion requirement is to give officials "time and opportunity to address complaints internally" and is sufficient if it provides officials with a fair opportunity to address the problem that will later form the basis of the lawsuit).  Accordingly, Defendant's motion for summary judgment to dismiss Plaintiff's claims for failure to exhaust administrative remedies is denied.

### B.    Excessive Force and Qualified Immunity.

Plaintiff claims that Defendant used excessive force against him on October 17, 2013, when he applied the hand restraints too tightly and failed to loosen them when Plaintiff informed them they were too tight.  Plaintiff claims that the five to ten minutes during which the restraints were on aggravated his preexisting carpal tunnel syndrome on both wrists, and that Defendant's conduct has caused him continuing pain thereafter. Plaintiff has no complaints about the medical care he received and is continuing to receive to treat his carpal tunnel syndrome.  (D.E. 64, p. 5).

*Qualified immunity defense.*

Defendant claims he is entitled to qualified immunity to defeat Plaintiff's excessive force claim against him.  The United States Supreme Court has held that "government officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   The Fifth Circuit has repeatedly held that "objective reasonableness in a qualified immunity context is a question of law for the court to decide, not an issue of fact.  *Atteberry v. Nocona Gen. Hosp.,* 430 F.3d 245, 256 (5th Cir. 2005); *Williams v. Bramer,* 180 F.3d 699. 703 (5th Cir. 1999); *Mangieri v. Clifton,* 29 F.3d 1012, 1016 (5th Cir. 1994).   A two-prong analysis is employed in determining whether a defendant is entitled to qualified immunity.  First, the district court looks to "whether a constitutional right would have been violated on the facts alleged" and second, "whether the right was clearly established."  *Saucier v. Katz,* 533 U.S. 194, 200 (2001).  The district court is permitted to exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.  *See Pearson v. Callahan*, 555 U.S. 223*,* 236 (2009) (holding that while the sequence in *Saucier* "is often appropriate, it should no longer be regarded as mandatory").

Once the defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  *McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002).  "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority."  *Salas v. Carpenter,* 980 F.2d 299, 306 (5th Cir. 1992).  Because defendant has raised the defense of qualified immunity in a motion for summary judgment, Plaintiff "can no longer rest on the pleadings … and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity analysis]."  *McClendon,* 305

F.3d at 232 (quoting *Behrens v. Pelletier,* 516 U.S. 299, 309 (1996)).   Accordingly, the Court must determine whether Plaintiff has presented sufficient evidence that Defendant's conduct violated an actual constitutional violation, and also, whether Defendant's conduct was objectively unreasonable in light of clearly established law. *McClendon,* 305 F.3d at 232.

*Excessive force.*

Inmates have a constitutional right to be free from the use of excessive force.  *See Anthony v. Martinez,* 185 Fed. Appx. 360, 363 (5th Cir. 2006).  To state an excessive force claim, a plaintiff must show that the force was not applied in a good-faith effort to maintain or restore discipline, but was applied maliciously and sadistically to cause harm, and that the injury he suffered was more than *de minimis* but not necessarily significant. *See Hudson v. McMillian*, 503 U.S. 1, 6-7, 10, (1992).   That is, a prison official's "excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury."  *Id.* at 4; *see also Wilkins v. Gaddy,* 559 U.S. 34, 38 (2010) (reversing district court's dismissal of prisoner's excessive force claim based entirely on its determination that his injuries were "*de minimis*," reasoning that it was "at odds with *Hudson's* direction to decide excessive force claims based on the nature of the force rather than the extent of the injury.").   Additional relevant objective factors in the inquiry of the application of excessive force include (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible

officials; and (5) any effort made to temper the severity of a forceful response.  *Gomez v. Chandler*, 163 F.3d 921, 923-24 (5th Cir. 1999).

The Fifth Circuit has recognized that "the amount of force used must be judged by the context in which the force was deployed." *Ikerd v. Blair*, 1010 F.3d 430, 434 (5th Cir. 1996).  Prison guards and officials are afforded broad latitude to maintain order in the prison systems.  Courts have "long recognized the need for prison officials to maintain order and discipline, *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986), and "broad deference is given to such decisions." *Hudson,* 503 U.S. at 6.  *See also Bell v. Wolfish,* 441 U.S. 520, 547 (1979) ("prison administrators … should be accorded wide-ranging deference in the adoption and executions of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").  Furthermore, prison guards work under circumstances where they "may [need] to act quickly and decisively." *Valencia v. Wiggins,* 981 F.2d 1440, 1446 (5th Cir. 1993.

Plaintiff admits that, as he walked to medical to get his insulin shot, he questioned Captain Taylor about the decision to move him out of his single-man cell and to place him in a cell with an inmate who, at the time, Plaintiff believed to be a racist.  (D.E. 44-4, *Sp.* Tr., pp. 8-9).  Plaintiff admits further that he and Defendant "got to talking loud," and Defendant asked Plaintiff if he was threatening him, which Plaintiff denied doing.  *Id.*. p. 9.  However, in response to this question, Plaintiff "just turned around" and Defendant put the restraints on.  *Id.*  Captain Taylor put the restraints on too tight, but Plaintiff

concedes that, by the time he told him the restraints were too tight, "we were headed to Medical to get an evaluation…".  (D.E. 44-4, p. 10).  As they were walking, a lieutenant and another officer arrived and they escorted Plaintiff to medical while Defendant left. *Id.*  The restraints were removed at medical.[5]  *Id.,*p. 20.

The Fifth Circuit has ruled that simply placing handcuffs on an offender too tightly alone does not amount to excessive force.  *Glenn v. City of Tyler,* 242 F.3d 307, 314 (5th Cir. 2001).  "Minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."  *Freeman v. Gore,* 483 F.3d 404, 417 (5th Cir. 2007).  In *Glenn,* the pretrial detainee alleged that the arresting officer put the handcuffs on her too tightly causing her right wrist too swell.  *Glenn,* 242 F.3d at 314.  She did not allege that the officer had acted with malice or intent to cause harm.  *Id.*  In contrast, long-term nerve damage resulting from handcuffing can support an excessive force claim.  *Deville v. Marcantel,* 567 F.3d 156, 168 (5th Cir. 2009).  For example, in *Fennell v. Quintela,* 393 Fed. Appx. 150 (5th Cir. 2010), the plaintiff complained that a defendant had ordered him to place his hands through the food slot so she could remove his handcuffs.  *Id.* at 152.  However, that defendant grabbed the plaintiff's wrists and twisted them, which resulted in an injury to Fennel's wrist and shoulder.  *Id.* at 152.  The Fifth Circuit concluded that, if proven, the plaintiff's version of events "would allow a reasonable jury to find that [the defendant] used excessive force in violation of the Constitution.  *Id.* at 156.

---

[5] Contrary to Plaintiff's Step 1 grievance, the restraints were removed at the infirmary and not by Captain Taylor after Plaintiff agreed to move.

The facts of this case are more similar to those in *Glenn*.  Plaintiff and Defendant were walking to medical for Plaintiff to get his insulin shot.  Plaintiff was agitated about the proposed move, and Captain Taylor needed to maintain order, so he ordered Plaintiff to submit to hand restraints.  Plaintiff submitted to the restraints without hesitation or argument.   Plaintiff offers no evidence to suggest that Captain Taylor was acting maliciously or sadistically when he applied the handcuffs: there was no twisting, pulling or jerking of Plaintiff's arms.  Plaintiff did complain that the restraints were on too tight, however at that time, Captain Taylor was leaving the area, and the other escorting officers had arrived, and they did not remove the restraints until Plaintiff got to medical. Plaintiff testified that he wore the tight restraints between five to ten minutes.  As he was getting his insulin shot, Plaintiff told the nursing staff that his wrists hurt from the restraints.  He was told to submit an emergency Sick Call Request (SCR).  (D.E. 44-4, *Sp* Tr., p. 12).  However, according to his medical records, Plaintiff did not submit a SCR that day about his wrists, nor did he do so on October 18 or 19, although he did report to the MCU emergency room on October 19th complaining of shortness of breath and chest pain.  (D.E. 45-1, pp. 3-5).  It was not until October 22, 2015 that he sought medical assistance for his wrist pain.  (D.E. 45-1, pp. 6-8).  Moreover, when he was seen on October 22, 2015, PA Echavarry noted no bruising, swelling or redness to Plaintiff's wrists, but only a scar on his left forearm from his past carpal tunnel surgery.  (D.E. 45-1, p. 7).

The uncontroverted medical evidence shows that Plaintiff does suffer from SLAC, (scapholunate advanced collapse) meaning the ligament between two of his carpal bones

in his right hand is completely torn, and based on the timing of the use of the handcuffs and when the symptoms arose, it seems reasonable that the application of the hand restraints on October 17, 2013 could have caused Plaintiff's injury, but there is no medical evidence stating as such.  However, the fact that Plaintiff has suffered a serious injury does not equate with a finding that Captain Taylor acted maliciously or sadistically.  At most, the evidence suggest that he was negligent when he applied the restraints too tightly and did not loosen them immediately, knowing they would be removed as soon as Plaintiff arrived at medical.  Although Plaintiff suffered more than a *de minimis* injury, the fact that he was accidently placed in tight hand restraints for five to ten minutes is not the type of egregious punishment that shocks the conscience of mankind or otherwise invokes the protections of the Eighth Amendment.  That is. Plaintiff's allegations fail to state a cognizable excessive force claim.

Further, Captain Taylor's actions were objectively reasonable.  Plaintiff admits that he was objecting to the move and arguing with Defendant as they walked to medical. To keep the matter from escalating, Defendant placed Plaintiff in restraints.  Plaintiff does not suggest that Defendant acted out of anger or handled him roughly; his only complaint is that the restraints were too tight.  However, he did not submit a SCR the next day, nor did he complain about his wrist when he went to the infirmary on October 19, 2013.  Indeed, he did not complain about his wrists until October 22, 2013, and at that medical visit, there was no bruising, swelling, or redness to his wrists.  Finally, the fact that only Plaintiff's right wrist has been diagnosed with SLAC suggests that it is a combination of factors, and not the 5 to 10 minutes that he was placed in too-tight

restraints, that caused his current injury.  Plaintiff fails to point to any evidence to suggest that Captain Taylor's actions were objectively unreasonable.

## VI.    CONCLUSION.

Plaintiff properly exhausted his administrative remedies, and therefore, Defendant's motion for summary judgment on that basis is denied.  However, there is no genuine issue of a material fact that Captain Taylor did not act maliciously or sadistically when he applied hand restraints to Plaintiff on October 17, 2013, and despite Plaintiff's Injuries, Defendant's actions were objectively reasonably.  Accordingly, Defendant's motion for summary judgment (D.E. 44) is GRANTED, and Plaintiff's excessive force claim against Defendant is dismissed with prejudice.

ORDERED this 1st day of October, 2015.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE